UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Julie Ann Tabor,                                             Civil No. 17-1200 (FLN)

       Plaintiff,

      v.                                                    **ORDER**

Nancy A. Berryhill,
Acting Commissioner of Social Security,

       Defendant.

_____

David Christianson and William Kruger, for Plaintiff.
Bahram Samie, Assistant United States Attorney, for Defendant.
_____

Plaintiff Julie Ann Tabor seeks judicial review of the final decision of the Acting

Commissioner ("Commissioner") of the Social Security Administration ("SSA"), who denied her

application for disability insurance benefits under Title II of the Social Security Act. This Court

has jurisdiction over the claim pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), 28 U.S.C. §

636(c), and Rule 73 of the Federal Rules of Civil Procedure. The parties have submitted cross

motions for summary judgement. *See* ECF Nos. 11 and 13. For the reasons set forth below, the

Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE**.

## 1. INTRODUCTION

On May 7, 2007, Tabor applied for disability insurance benefits ("DIB"). Administrative

Record ("AR")  95; ECF No. 10.  Tabor alleged her disability began on November 30, 2004. *Id.*

On October 25, 2007, the SSA denied Tabor's application for DIB. *Id.* On April 11, 2012, Tabor

again applied for DIB. AR 93, 170–76. Tabor's second application was denied on August 6,

2014, and upon reconsideration on December 22, 2014. AR 117–19. On January 21, 2015, Tabor filed a written request for a hearing. AR 127. An administrative hearing was held before Administrative Law Judge ("ALJ") Peter Kimball on February 18, 2016. AR 11, 41. On March 8, 2016, the ALJ found that Tabor was not disabled, and denied her application for DIB. AR 11–25. On March 15, 2017, the SSA Appeals Council denied Tabor's request for review and finalized the ALJ's decision for purposes of judicial review. AR 1–6; *see* 20 C.F.R. § 404.981. On April 17, 2017, Tabor commenced this civil action seeking a reversal of the ALJ's decision, or in the alternative, to remand for further proceedings. ECF No. 1 at 3.

## II. FINDINGS OF FACTS

### A. Background

Tabor was forty-six years old when she applied for disability benefits. AR 170–76. Tabor has at least a high school education and past relevant work as a licensed daycare provider, and a team lead at Target. AR 54–56; *See* 511. Prior to her application for DIB, Tabor held steady employment. AR 185. She lives with her husband and her two children. AR 51. Tabor claims the following severe impairments prevent her from securing and maintaining competitive employment: diabetes, cervical spondylosis from c1-2 thru c6-7, lumbar spondyloptis 15-51, spinal stenosis, stroke, and short term memory issues. AR 234.

### B. Medical Evidence

On January 25, 2006, Tabor had a magnetic resonance imaging ("MRI") of her brain. AR 338. The image showed an abnormal signal on the left occipital lobe due to an old infarction that was acute in November 2005, but no evidence of recent infarcts. *Id.* An MR angiogram also confirmed arotid siphon diseases in March 2004. *Id.*

On June 27, 2006, Tabor visited Arthur Klassen, M.D., in the Neurology Clinic at the University of Minnesota Medical Center. AR 412–13. Tabor informed Dr. Klassen her headaches waned in severity and occasionally became severe. AR 412. At that time, Tabor was taking 25 mg of Metoprolol daily, 20 mg of Lovastatin daily, 240 mg of Verapamil daily, 20 mg of Lisinopril daily, 325 mg of Asprin daily, 10 mg daily Lexapro daily, and four to six tables of Vicodin daily. *Id.* Dr. Klassen suggested that she increase her Metroprolol to 50 mg, and urged her to try not using Vicodin daily. *Id.*

On July 7, 2006, Tabor presented to Georgia Panopoulous, Ph.D. L.P. AR 355. Dr. Panopoulous diagnosed Tabor with pain disorder associated with psychological features and general medical condition, an adjustment disorder with mixed emotional features, pain and physical limitations, and headaches secondary to stroke. *Id.* Dr. Panopoulous recommended that Tabor participate in individual counseling and consider a conscious living program. *Id.*

The same day, Tabor presented to Alfred Clavel, M.D., for an evaluation of her headaches. AR 357. Tabor informed Dr. Clavel that the onset of her headaches began in November 2005, and had occurred daily since that time. *Id.* Tabor stated that her headaches started shortly after she wakes up, and became worse by the end of the day. *Id.* She claimed her pain was completely interfering with sporting activity, work, chores, and sex, and moderately interfering with her walking, sitting, and emotions. *Id.* Tabor, however, did not show any significant migraine features such as sensitivity to light and sound, or nausea and vomiting. *Id.* Dr. Clavel also noted that Tabor was taking four to six Vicodin per day, which completely got rid of her headaches for a temporary basis. *Id.* Dr. Clavel noted that palpation of her muscles reproduced her headaches, but that simple breathing and stretching resulted in complete

resolution of her headache before they gradually returned as the tension built up. AR 360. Dr. Clavel recommended a multi disciplinary team approach for Tabor to better manage her headaches including working with a health psychologist to address issues of muscle tension, and other factors affecting her pain. AR 361. Dr. Clavel did not prescribe Tabor any medication, but said that she would need some type of rescue medication in the future. *Id.*

In August of 2006, Tabor presented to Joan Jones, N.P., to discuss her weight and not wanting to have a gastric bypass. AR 441. The medical notes during that visit state that Tabor's headaches are related to her stroke, and that the neurology department said "there is little that they can do." *Id.* Tabor again presented to Jones in August of 2006 regarding her headaches. *Id.* During that visit, Tabor was told to continue taking Vicodin for her headaches, and the plan was for her to gradually get off the medication. *Id.*

In January of 2007, Tabor had a computerized tomography ("CT") scan of her head. AR 334. The scan showed there were no new intracranial findings, no radiographic abnormalities, and visualized parts of the paransal sinuses appeared normal. *Id.* Tabor received another CT scan of her head in September of 2014. AR 342. Results from that scan showed no acute changes, no fracture or soft tissue swelling, and no acute intracranial pathology. *Id.*

In June of 2007, Tabor completed a SSA functional report. AR 191–98. Tabor reported that she gets up in the morning, feeds her two children, and puts her eight year old son on the bus. AR 191. Tabor has lunch around noon, and picks up her eight year old son from the bus at 3:50 p.m. before having dinner. *Id.* She reported that she bathes the kids around 7:30 p.m. with help from her husband, puts them to bed around 9:00 p.m., and goes to bed around 11:00 p.m. *Id.* She also reported that she does not get any help from her husband in caring for her children, or

need any special reminders to take care of her personal needs, or to take her medication. AR 191–92. Tabor stated that when her headaches get severe she puts a cold rag on her head. AR 192. Tabor pays the bills, drives  her sons to school, drives to the grocery store by herself, and talks on the phone with others daily. AR 194–95. She reported that ever since her strokes in 2004 and 2005, she has had severe headaches on a daily basis, and goes to the emergency room between two to four times a year. AR 198. She also said that her strokes affected her vision and short term memory. *Id.*

On July 18, 2007, Tabor visited Jones for a follow up regarding her diabetes mellitus and blood pressure. AR 509. Even though headaches were listed as active problems for Tabor, she reported that she was exercising thirty to forty-five minutes a day, was feeling well, and had no specific complaint. *Id.*

On October 15, 2007, licensed psychologist Philip Sarff, Ph.D., completed a consultative examination report for Tabor. AR 511–17. Dr. Sarff opined that Tabor arrived at the interview alert and oriented to person, place, and time. AR 512. According to Dr. Sarff, Tabor maintained good eye contact, was cooperative, pleasant, and interacted in a logical and coherent manner. AR 512. Tabor informed Dr. Sarff that she had suffered three strokes in 2004 and 2005, and that since her strokes, she no longer enjoyed being in social situations, would get antsy, claustrophobic, and her head would start to hurt. *Id.*  During the interview, Tabor said that she had been feeling down and cried a lot. *Id.* at 513. Tabor stated that she gets "bursts of energy," even though she is generally tired. *Id.* Tabor reported experiencing anxiety and demonstrating compulsive behaviors such as excessive hand washing. *Id.* Tabor suggested no issues with her long-term memory, but mentioned having to write short-term things down to remember them. *Id.*

Tabor reported to Dr. Sarff that she bathed every two or three days, brushed her teeth and changed her clothing daily, cooked two or three nights a week, made her children's beds, washed dishes, did the laundry, and cleaned the kitchen and bathroom once a week. *Id.* Tabor said she vacuumed the floor every other week and dusted before guests came over. *Id.* Tabor also reported mowing, raking, and shoveling the lawn. *Id.* She stated that it takes her longer to do large jobs, and that she sometimes needs a break. *Id.* Tabor stated that she was able to watch television, and play cards, video games, and cribbage. AR 513–14. Dr. Sarff reported that Tabor's typical day was as follows:

> [M]s. Tabor wakes up at 6:30 a.m., brushes her teeth and washes her face. She then has 45 minutes to herself before she wakes up her sons, dresses them, feeds them, and gets them to the bus at 8:45. She watches her nephew during the morning, and she takes care of her granddaughter while her son is at work. At 11:30, she makes lunch, and then her nephew goes to school at 12:30. Ms. Tabor then does work around the house and plays games on the computer. Her husband and children get home at 4:00, and they all eat dinner at 6:30. She puts her children to bed at 10:00. Then she has some time alone with her husband before they go to bed at about 11:30 or midnight.

AR 514.

Dr. Sarff opined that Tabor had a low average range of intelligence. *Id.* at 515. Tabor's concentration skills were in the low average range (12th percentile), and her ability to process visual information quickly and efficiently was in the borderline-deficient range (8th percentile). *Id.* With regard to her verbal tests, Dr. Sarff opined that Tabor showed average practical problem solving, social judgment, and commonsense reasoning skills. *Id.* Dr. Sarff opined that her overall pattern of scores showed moderate problems acquiring and retaining new information. *Id.* Dr. Sariff found Tabor's Global Assessment of Functioning (GAF) score was a 64. *Id.*

Dr. Sariff made the following observations:

Based on today's examination, Ms. Tabor appears capable of understanding simple and repetitive instructions; her ability to retain verbal directions is likely variable, and intermittently poor. She appears capable of performing simple tasks with persistence, but she will likely have trouble maintaining concentration when stressed and fatigued. Her persistence as observed to be good, in spite of getting frustrated, during the testing. Her social skills are adequate, and she should be able to get along well with coworkers and supervisors on a superficial level. While she may feel overwhelmed when under sustained stress and pressure, she should be able to handle normal amounts of stress and pressure at work.

AR 517. Dr. Sariff concluded that Tabor was a good candidate for vocational rehabilitation services. *Id.*

On January 18, 2010, Tabor visited Fairview Lakes Regional Medical Center. AR 602. Tabor's visiting notes state that her headaches had improved. *Id.* Medical records from 2012 similarly state that Tabor was taking Vicodin for her back pain, but make no mention of her headaches. AR 642.

On February 22, 2013, Tabor visited Thomas R. Vieser, M.D., at Midwest Spine Institute complaining of neck pain, daily frontal headaches, bilateral arm pain, mid/low back pain, bilateral hip pain, and bilateral buttock pain. AR 582. Dr. Vieser found that Tabor was very limited with regards to her ability to work. AR 587. He limited her ability to work to four hours a day, her sitting, standing, and walking to two hours a day each, and said that she would have to change position every thirty minutes. *Id.* Dr. Vieser opined that Tabor would not be able to handle gainful employment and recommended that she apply for social security benefits. *Id.*

### C. Administrative Hearing

An administrative hearing was held on February 18, 2016. AR 11, 41. Attorney William J. Kruger represented Tabor, who testified on her own behalf. AR 41–92. Vocational Expert

("VE") Jesse Ogren, and Medical Expert ("ME") Joseph Horozaniecki, MD., also testified at the hearing. AR 41, 76–92.

### 1. ME Testimony

The ALJ asked the ME what impairments Tabor suffered between November 30, 2004, her alleged onset date, through September 30, 2008. AR 76. The ME testified that as a result of the two cerebral vascular accidents Tabor suffered in 2004 and 2005, that she had visual field loss, as well as chronic daily headaches. AR 76–77. The ME opined that while Tabor had a post ventral hernia repair, he did not consider that a severe impairment because it did not last twelve months. AR 77. The ALJ then asked the ME whether any of Tabor's impairments met or equaled a listing. AR 78. The ME testified that Tabor's disabling headaches in combination equaled listing 11.03, non-convulsive epilepsy. AR 78–79. The ME testified that listing 11.03 was commonly used for disabling headaches that occurred with a certain amount of frequency. AR 78. The ALJ then asked the ME whether Tabor's headaches were at some point no longer disabling or no longer equalling listing 11.03. *Id.* The ME testified that after 2008, Tabor's medical records did not mention headaches and that her headaches started re-emerging in her medical records in 2013. AR 80. The ME also testified that Tabor's headaches were not migrainous in nature. AR 81.

### 2. VE Testimony

The VE testified that Tabor's past relevant work included work as a nanny and a retail store supervisor. AR 82–83. The ALJ then posed the following hypothetical to the VE:

> consider a hypothetical individual with the same age, education, [and] past work .
> . . [who] is limited to lifting and carrying 50 pounds occasionally and 25 pounds

frequently; able to sit for six hours out of an eight-hour day; stand for six hours out of an eight-hour day; walk for six hours out of an eight-hour day; push and pull as much as can lift and carry. There will be no climbing of ladders or scaffolds; no work with exposure to unprotected heights or moving mechanical parts. And in terms of understanding, remembering, and carrying out instructions, the person is limited to performing simple, routine tasks. Based on this first hypothetical, could any of the past work be performed?

AR 83. The VE testified that an individual with the residual functional capacity described in the hypothetical would not be able to perform Tabor's past relevant skilled, and semi-skilled work. AR 84. The VE, however, identified three jobs in the national economy that a person with those limitations could perform. AR 84. The VE identified cleaner with approximately 24,000 available jobs in Minnesota; laundry worker with approximately 3,500 available jobs in Minnesota; and hand packager with approximately 2,000 available jobs in Minnesota. *Id.* The VE testified that each of these jobs qualified as medium level work. AR 84–85.

The ALJ then posed another hypothetical to the VE whereby an individual with the same profile and the same limitations "would be further limited to being off task at least ten percent of the time as a result of headaches and consistent absence." AR 85. The VE opined that the second hypothetical would make full-time competitive employment no longer possible, and that based on his experience that unskilled jobs allow employees to be absent up to two days a month to still maintain employment. *Id.*

### 3. The Commissioner's Decision

On March 8, 2016, the ALJ issued a decision that Tabor was not disabled and not entitled to benefits. AR 11-25. In determining that Tabor was not disabled, the ALJ followed the five-step sequential process established by the SSA. *See* 20 C.F.R. § 404.1520(a)(4).

The first step in the sequential evaluation is to evaluate the claimant's work history to see if they are engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.15071, 416.971. If the claimant has performed substantial work activity, then she is not disabled. *Id.* At step one, the ALJ found that Tabor had not engaged in substantial gainful activity since November 30, 2004, the alleged onset date of her disability, through her date last insured of September 30, 2008. AR 13.

In the second step of the sequential evaluation, the ALJ is to determine whether the claimant has a severe, medically-determinable impairment, or combination of impairments, that significantly limits an individual's ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). At step two, the ALJ found that Tabor had the following severe impairments: status post two cerebral vascular accidents in 2004 and 2005, a history of chronic headaches, obesity, diabetes mellitus, cognitive disorder, depressive disorder, anxiety disorder, and degenerative disc disease of the lumbar and cervical spine. AR 13.

The third step in the sequential evaluation requires the ALJ to determine whether the claimant has an impairment that meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d), 404.1525, 404.1526. If, at this step, the ALJ finds that the claimant's impairments or combination of impairments do not meet or medically equal the criteria of a listing, nor meet the duration requirement, then the ALJ's analysis must proceed to the next step. At step three, the ALJ found that Tabor did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. AR 14. The ALJ considered whether Tabor's headaches medically equaled listing 11.03 based on the recommendation of the ME. *Id.* The ALJ, however, found that the ME's

testimony failed to show that her headaches were disabling from October 27, 2007, the date of the initial determination of her prior claim, through to September 30, 2008, the expiration of Tabor's date last insured. *Id.* The ALJ also observed that Tabor had no treatment records during the relevant time period, and that both Tabor and the ME noted her headaches improved over time. *Id.* Based on this, the ALJ concluded that Tabor's relative lack of treatment during this time was consistent with an improvement in her condition. *Id.*

Where a claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's Residual Functional Capacity ("RFC"). *See* 20 C.F.R. § 404.1520(e). Here the ALJ concluded that Tabor had an RFC to:

> [p]erform medium work as defined in 20 CFR 404.1567(c). [She] is able to lift/carry, push/pull up to 50 pounds occasionally and 25 pounds frequently. She can sit 6 hours, stand 6 hours, and walk for 6 hours total in an 8-hour workday. The claimant is further precluded from climbing ladders and scaffolds and from exposure to unprotected heights and moving mechanical parts. In terms of understanding, remembering and carrying out instructions, she is further limited to simple, routine tasks.

AR 17. The ALJ also found that Tabor's statements concerning the intensity, persistence and limiting effects of her medically determinable impairments, notably her headaches, were not credible to the extent that they were not consistent with the objective medical evidence and other evidence. AR 18.

In the fourth and fifth steps of the sequential evaluation process, the ALJ must determine whether the claimant has the RFC to perform either her past relevant work or any other jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1512(g), 404.1520(f), 404.1560(c), 416.912(g), 416.920(g), 416.960(c). If the claimant cannot perform her past relevant work, then the "burden shifts to the SSA to prove, first, that the claimant retains the

residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

At step four, the ALJ found that Tabor was not able to perform her past relevant work. AR 23. The VE noted that Tabor's past relevant work as a nanny and a retail store area supervisor was semi-skilled and skilled in nature, respectively, and that her RFC limited her to unskilled work. *Id.*

At step five, however, the ALJ found that given Tabor's age, education, work experience ,and RFC, there were jobs in significant numbers in the national economy that Tabor could perform. AR 23. But that Tabor's ability to perform a full range of medium work was impeded by additional limitations. AR 24. Consequently, the ALJ sought testimony from the VE to determine the extent to which Tabor's limitations eroded her ability to perform unskilled medium work. *Id.* The VE testified that Tabor could perform jobs such as cleaner, laundry worker, and hand packager. *Id.* The ALJ found the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles. *Id.* As a result, the ALJ concluded that Tabor was capable of doing other jobs that existed in the national economy, and thus was not disabled under the Social Security Act. *Id.*

### III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Quals v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome. . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436

(8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* Therefore, this Court's review of the ALJ's factual determinations is deferential, and does not re-weigh the evidence nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th. Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th. Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV. CONCLUSIONS OF LAW

Tabor asks the Court to reverse the ALJ's decision because substantial evidence in the record as a whole does not support the Commissioner's conclusion that Tabor is not disabled. *See* ECF No. 12 at 2. Specifically, Tabor argues that: (1) the ALJ erred in  finding that her headaches did not equal medical listing 11.03; (2) the ALJ erred in determining that her RFC makes her eligible to perform other work in the national economy; (3) the ALJ erred in failing to analyze and take into consideration the *Polaski* factors in determining Tabor's credibility; and (4) the VE's testimony that jobs existed for Tabor's RFC did not constitute substantial evidence. *Id.* at 4–14. The Commissioner, at the outset, states that the relevant time period is from October 27, 2007, the date of the initial determination of Tabor's prior claim, to September 30, 2008, Tabor's date last insured. ECF No. 14 at 4. Based on this, the Commissioner asserts that the evidence in the record supports a finding that Tabor's headaches did not meet or equal listing 11.03, and that the ALJ properly assessed Tabor's RFC. *Id.* at 5–13. Additionally, the Commissioner argues that

the ALJ's credibility determination was supported by the record as a whole, and the ALJ was correct in relying on the VE's testimony in finding Tabor not disabled. *See id.*

### A. Relevant Time Period

An initial determination becomes binding unless a claimant requests reconsideration, or the case is reopened as a result of the SSA's own determination. *See* 20 C.F.R. §§ 404.905, 404.987(a). A determination or decision may be reopened by the SSA within twelve months of the date of the initial determination, for any reason, or within four years of that date, for good cause. *See* 20 C.F.R. § 404.988. Good cause is found where: "(1) [n]ew and material evidence is furnished; (2) [a] clerical error in the computation or recomputation of benefits was made; or (3) [t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. § 404.989(a). "Additionally, if the Secretary reconsiders the merits of an application previously denied, the claim may properly be treated as having been reopened as a matter of administrative discretion." *Brown v. Sullivan*, 932 F. 2d 1243, 1245 (8th Cir. 1991).

In the present case, Tabor filed her initial application for DIB on May 7, 2007, and received her initial determination on October 25, 2007. AR 95. On April 11, 2012, more than four years after Tabor's initial determination, she filed another application for DIB. AR 170–76. That application was denied on August 6, 2014, and upon reconsideration on December 22, 2014. AR 117–19. On January 21, 2015, Tabor filed a written request for a hearing, and on March 8, 2016, the ALJ found that Tabor was not disabled from November 30, 2004, her alleged onset date, through September 30, 2008. AR 11–25, 127. Tabor now argues that the ALJ, by citing to records from 2005 and 2006, in his March 2016 decision, re-opened her initial

determination, subjecting all evidence in the record to judicial review. *See* ECF No. 15. Tabor

asks this Court to review all of her medical records, including those from 2004 through 2008, in

determining whether the ALJ's decision was supported by substantial evidence in the record. *Id.*

The Commissioner conversely argues that the Court should only review Tabor's medical records

from October 25, 2007, to September 30, 2008, in determining whether the ALJ's decision is

supported by substantial evidence in the record. ECF No. 14.

In his determination, the ALJ specifically addressed Tabor's previous claim for DIB, and

held that "[t]here is no new evidence addressing the period prior to the expiration of the date last

insured, since the claimant last filed. In fact, there is essentially no medical evidence from

October 25, 2007 to the date last insured." AR 18.   Accordingly, this Court finds that the ALJ

did not re-open Tabor's previous claim and only her medical records from October 25, 2007,

through September 30, 2008, are relevant in determining whether the ALJ's decision is supported

by substantial evidence in the record. This Court also observes that the ALJ's decision is more

than four years from Tabor's initial determination.

### B. Listing 11.03

At step three in the sequential process, the claimant has the burden of proving that he or

she meets or equals a listing. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "To

establish equivalency, a claimant 'must present medical findings equal in severity to all the

criteria for the one most similar listed impairment.'" *Carlson v. Astrue*, 604 F.3d 589, 594 (8th

Cir. 2010). Listing 11.03, part of the Neurological category of impairments, provides as follows:

> 11.03 Epilepsy—non-convulsive epilepsy (petit mal, psychomotor, or focal),
> documented by detailed description of a typical seizure pattern, including all
> associated phenomena; occurring more frequently than once weekly in spite of at
> least 3 months of prescribed treatment. With alteration of awareness or loss of

consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpart 4, Appendix 1, § 11.03.[1]

Tabor argues that the medical evidence, as a whole, supports a finding that Tabor's chronic headaches equal listing 11.03. *See* ECF No. 12 at 5. The ALJ, in his decision, considered whether Tabor's headaches equaled listing 11.03, and ultimately concluded that her headaches did not equal listing 11.03 because there was no treatment records from October of 2007, through the expiration of Tabor's last date insured, September 30, 2008, that showed Tabor had chronic headaches during that   relevant time period. AR 14. The ALJ also gave little weight to the ME's testimony[2] that Tabor's headaches equaled listing 11.03 because the medical evidence did not support the ME's testimony that Tabor had chronic headaches during the relevant time period. *Id.* This Court cannot reverse the ALJ's decision merely because substantial evidence would have supported a contrary outcome, or because we may have reached a different conclusion. *Roberts*, 222 F.3d at 468. If the ALJ's decision is supported by substantial evidence, we must affirm. Here, the ALJ noted that both the ME and Tabor stated that her headaches had improved over time. Based on Tabor's lack of significant treatment within the time period, and evidence of her

---

[1] The SSA revised Listing 11.03 effective September 29, 2016. *See* Revised Medical Criteria for Evaluating Neurological Disorders, 81 FR 43048-01. This matter was decided prior to the revision taking effect, and thus this action is not governed by the revision.

[2] The ME testified that Tabor, "certainly does not have epilepsy, but this listing is commonly used for disabling headaches that occur with a certain amount of frequency. I think the medical record did support that these headaches were, indeed, disabling in that matter - - in that time frame." AR 78.

improvement, the ALJ concluded that Tabor's headaches did not medically equal or meet any of the listing during the relevant period. *See id.* This Court agrees.

Almost all of the medical evidence Tabor cites to in support of her argument that her headaches equal listing 11.03 fall outside of the relevant time period. Moreover, there is substantial evidence in the record to support the ALJ's observation that the records suggest Tabor's headaches improved over time. Accordingly, this Court finds that substantial evidence in the record as a whole support the ALJ's determination that Tabor did not have an impairment that met or equaled one of the listings.

### C. RFC Determination

Tabor also argues that the ALJ's RFC determination is not supported by substantial evidence in the record. *See* ECF No. 12 at 7–8. Specifically, Tabor argues that the ALJ failed to take into account her headaches, ignored her subjective complaints, and disregarded the VE's testimony that she was not capable of performing any job in the national economy because of her headaches. *Id.* at 8. "[A] claimant's [RFC] is a medical question" that requires "[s]ome medical evidence" in support. *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). Here, the ALJ found that there was essentially no medical records related to Tabor's headaches during the relevant time period. This Court's review of the ALJ's factual determination is deferential, and it neither re-weighs the evidence, reviews the factual record *de novo*, *see Flynn*, 107 F.3d at 620, nor reverses when an ALJ's decision falls within a reasonable "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Because the ALJ's RFC determination relied on his factual determination of the record, and because that finding was within a reasonable zone of

choice, this Court concludes that substantial evidence in the record, as a whole, exists to support the ALJ's RFC determination. *See id.*

As to Tabor's subjective complaints, "[w]hen evaluating the claimant's subjective complaints, the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history," and all evidence relating to: (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is not required to consider every *Polaski* factor when making a determination of credibility. *See Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017). "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski*, 739 F.2d at 1322. Here, the ALJ found that the lack of treatment or doctors visits over the relevant period undermined Tabor's credibility that she was unable to work or function based on her headaches. AR 18. The ALJ specifically noted that while Tabor received treatment for her headaches in 2006, that by 2007, she reported feeling well with no specific complaint, and in 2010 she reported that her headaches had improved. AR 19. Additionally, the ALJ observed that in July of 2007, Tabor reported that she was exercising thirty to forty-five minutes per day, and was feeling well. AR 21. Tabor's function report in 2007 similarly showed that she was able to get her son ready for school, had no difficulty in personal care, and while she reported she had headaches, she was able to clean her house. *Id.* Based on this, the ALJ found that Tabor was capable of functioning within the limitations provided in her RFC. Although the ALJ did not explicitly discuss each of the *Polaski*

factors in depth, this Court concludes that the ALJ gave ample explanation for his RFC determination, and there is substantial evidence in the record to support his conclusion.

Lastly, Tabor argues that the first hypothetical question, which the ALJ relied on in determining that jobs exist in the national economy that Tabor could perform, did not constitute substantial evidence. ECF No. 12 at 14. An ALJ may rely on testimony that is based on a hypothetical question that includes all those impairments that are substantially supported by the record. *See Taylor v. Chater*, 118 F.3d 1274, 1278–79 (8th Cir. 1997). Because this Court finds that there is substantial evidence in the record to support the ALJ's determination that Tabor's headaches were not a severe impairment, this Court consequently finds that the ALJ's reliance on the VE's testimony to the first hypothetical, not taking into account Tabor's headaches, is also supported by substantial evidence in the record. This Court declines Tabor's invitation to re-weigh the evidence or second guess the ALJ's assessment of her headaches. *See, e.g.*, *Weise v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (reasoning that "it is not" the province of the court to re-weigh "evidence presented to the ALJ or to try [an] issue . . . de novo.") (internal citation omitted).

## V. CONCLUSION

If the ALJ's decision is supported by substantial evidence on the record, this Court cannot reverse simply because "substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468. Here, substantial evidence supports the ALJ's determination that Tabor was not disabled. Accordingly, the Commissioner's decision finding Tabor is not disabled, is affirmed.

## VI. ORDER

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Tabor's motion for summary judgment (ECF No. 11) is **DENIED**;

2.  The Commissioner's motion for summary judgment (ECF No. 13) is **GRANTED**;

3.  The Commissioner's decision is **AFFIRMED** and the case **DISMISSED WITH PREJUDICE**. **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 10, 2018                    *s/Franklin L. Noel*
                                          FRANKLIN L. NOEL
                                          United States Magistrate Judge